May it please the court. Stephen Shaw on behalf of Joanne Kilar. The first thing I want to talk about is this 81 million policyholder, uncertified class action. I think that was a little too simple for the district judge. It had to be simple because there were 80 million people involved. All we were asking for is we wanted a transfer to Florida on a declaratory relief action that said if the Blue Cross Blue Shield group is ordered to repay the doctors what they owe them and all the other health providers that they owe, that the subscribers should have the planned board members and the people who ran the show during this time the doctors were cheated, pay back the treasuries. That's all there is to it. And when I moved for severance, that's all there was to it. The district court wanted more. There isn't more. It's the common thread that unites 81 million people. I realize that Judge Moreno in Florida already threw out some subscriber claims in those MDL cases. Those are different. Worried about ERISA, worried about commonality and fraud and so on and so on. This is just a simple debt relief allegation. And all it is really is it's sort of an indemnity kind of claim. It says we want the doctors to be paid back. The doctors were the doctors of 81 million people. They should be paid. That's what 81 million people are arguing for. But at the same time, they don't want to lose their Blue Cross Blue Shield plans. So why not take the people who are being subjected to racketeering causes of action in Florida and let Judge Moreno decide whether or not he wants to throw the case out rather than have what happened here. This is not just going to be the first time. The court tells the court that there were 81 cases transferred to Judge Moreno. Not just a couple big ones that made the headlines. That court is a centralized court to handle these kind of issues. HMSA and Blue Cross are there right now. So the court, the district court has to take cognizance of there's a lot of cases going down. There's a reason to be transferred. Why not continue this on counsel's request or even sua sponte to allow this to be worked out? Instead, I couldn't get a continuance. Things were hurried along. And had the court granted my motion for continuance, a couple things would have happened. We could have processed the CTO in ordinary course, decided whether Judge Moreno was going to throw out the types of subscriber cases he was going to throw out, which would put us all back here. And also, in terms of the ERISA case, it would have allowed a little bit of time, even a week, to get the decision back from the state insurance commissioner that said that HMSA couldn't have the discretionary authority clause in their policies anymore. That would have substantially changed the lower court's ruling that you're faced with were dedicated to the discretionary authority clause and the discretionary authority that the insurance company has to do what they want. But the insurance commissioner Schmidt's decision came out a few days afterwards and said, you can't have that anymore. Well, what the district court judge said, right or wrong, was that under either standard, she would have ruled the same way. That's true. She had a, I would say, a fallback position at the end of her decision under de novo, which she would have gone de novo review. But it didn't have any analysis. There wasn't anything in the de novo standard which said that I'm going to decide this de novo, but I'm going to use the state's rules of construction. Or I'm going to use some other rules of construction. For instance, how is ambiguity construed? How are exclusions construed? And so on. There was nothing there. So as a fallback, I think that's just exactly what it was. The other problem was, and the way I see de novo, if this court, which I'm asking this court to apply a de novo standard, is what effect are you going to give the insurance commissioner's decision that the exclusion clause was ambiguous? I think it should have preclusive effect, even if the panel is going to decide de novo. The reason I think so is because HMSA failed to object to or to proceed against that finding in that forum. They had the right to and they had the perfect avenue to, but they never did it. So I think it's preclusive as to them. And there's also a waiver. They can't just sit back and say we accept it and then wait until I bring it up here and say we don't like it anymore. They were required to do more than just sit back and wait for developments. Well, let's say that we're going to possibly apply a de novo review here. Is not the procedure one that is still under study? And isn't it true that most of the authorities seem to think that this kind of operation should not have been done on this particular patient because of her advanced problems with emphysema? Well, as of today, I don't know. But as of then, you're right. The problem is, is that in the language of an insurance policy, how are you going to construe the exclusion? How are you going to construe something that the state insurance commissioner has already ruled was ambiguous? The person that buys an insurance policy, you know, has a right to make an informed decision whether they want to go with HMSA or whether they want to go with Kaiser. And if they read their exclusions and they say, well, look, this says investigatory and it is kind of hazy, so why not we'll take this instead of the Kaiser plan? They probably made an uninformed decision. If you follow the insurance commissioner's lead, he says it's capable of more than one meaning. When I read it, I say that, you know, you can get among those two meanings, you can get the meaning that says clinical trials are reimbursable. If it isn't a clinical trial, that doesn't end the question. There's still insurance provided for clinical trials. And I think the district court didn't see that. When the district court found that it wasn't ambiguous and that the district court had her own read on that clause, didn't understand that a going the other way could still be reimbursable, even if it was a trial. And even the commissioner sent it back for further study because of the necessity clause, not because of the investigative nature, as I read his opinion. Right. But the important thing is that the commissioner decided the exclusion to be ambiguous. And as a matter of right, I think we were entitled to, even under Danova's standard, to the analysis applying the state's rules of construction. The state's rules of construction of these clauses of exclusions and inclusions in insurance clauses is pretty standard. So we never had that benefit. And I think if the court would have gone through it, it would have been difficult to reach the result it did. Let me ask you this. Before the client under underwent this surgery, did the lung volume reduction surgery, did the surgeon or hospital tell her that it's not covered by insurance? No, as I recall, he submitted it to HMSA and then HMSA declined. It wasn't a it was a I forget the word, but before you have the surgery, you submit it to the company and you get an opinion whether the company is going to cover it or not. She still went forward with it and paid for it herself. Something says, oh, right. But she had no choice at that time and borrowed money and stuff and got it done. Because I know I saw a doctor and he had a new procedure, you know, like a nuclear medicine thing. And he told me, he said, well, I can put you through this, but insurance companies won't cover it. I knew. Well, a lot of these doctors didn't tell her, but it was presented in advance and the insurance companies said no. A lot of these problems can be solved by spending money on expensive lawyers fixing the documents. So they're clearer. They're bolder in print. They mean something. They're amended. They're up to date. They're not just a form that's Xeroxed. Right. But they're they're drafted. They're drafted for the benefit of the patient, for the benefit of the hospital. That gets me to the fraud allegation. What. All right. What was. So how did she get into this plan? She was her husband enrolled. It's standard saying that the husband was employed. He enrolled and she came on as his dependent through his job. Right. And we we dispute the issue of fraud. And as I understand it, it was negotiated by a union or anything like that. I'm not sure. And even if it was, the union would have been the representative of the husband. Well, did he have a choice of plan? Well, if he did, it would have been Kaiser. We have two plans in our state. I know. But did his particular employer. Did he have a choice? Oh, I'm not sure. I don't know. You said that the commissioner talks about. Ambiguous exclusion. What is the what does the exclusion in this case say? It said the record in two forty three at the top. And well, the discussion of excuse me, this I have the discussion of the exclusion. First of all. And that may answer the question, if I may. Yeah. What does the exclusion say? You are not covered for medical treatments, procedures, drugs or devices and all related services or supplies that are experimental or investigational. A medical treatment procedure, drug, device or care is experimental or investigative. If and then it gives some different bullets, for instance, marketed without approval of the FDA or the drug or device is utilized. I'm looking for the the clinical trials element. Here it is. Reliable. This is the one that applies to this case. Reliable evidence shows that the drug, device, medical treatment or procedure is the subject of ongoing phase one or phase two. Clinical trials is for the research, experimental study or investigational arm of ongoing phase three. Clinical trials or is otherwise understudy to determine its maximum tolerated dose, its toxicity, its safety, its efficacy or its facility as compared with a standard means of treatment or diagnosis or. And then it talks about another element. The commissioner's statement was the quoted plan language could be interpreted the way Dr. Moogu Moogu easy interpreted it. But it is also so susceptible to the interpretation that the patient must be participating in the trial for the exclusion to apply. And the district court judge disagreed with that. And the way I my read on it is that even if you are in clinical trials, there's still coverage sometimes. So it doesn't end the question. And the exclusions not only have to be, if the ambiguity is raised in the end, the court or the commissioner agrees, then it has to be construed against the insurance company. And it's strange to say that if the procedure is a subject of a clinical trial, we won't pay for it. And if we won't pay for it, according to maybe the insurance commission, suggest you could read it saying we won't pay for the people who are in a clinical trial. But if somebody else wants to on their own do the same thing that the clinical trial does, we would pay for it. Strange, strange way to read that. Well, the problem with it is that after the insurance commissioner made his finding of two meetings, then it was up to HMSA to pursue the that finding and do something about it. If it if it didn't want it to have some preclusive effect and all the way through this, these proceedings from the state circuit court to the district court and now HMSA has simply said we're not bound by that or it doesn't matter. And it does matter. And I think for purposes of anyone's de novo review, there is the question. De novo review goes to the way that HMSA handled the claims decision. Does, will de novo review also review the exclusion the insurance commissioner applied if HMSA waived all of its objections? Or will de novo review take countenance of the insurance commissioner's decision, the waiver by HMSA and its failure to object to that decision in the state proceedings and give it the preclusive effect it's entitled to? I've been urging that it's entitled to preclusion all the way through. And as in terms of rules of construction, there's more than one rule that applies. Not only is the rule of ambiguity, but the rule of exclusions and inclusions. The exclusion has to be strictly construed against the drafter, which is the company, and liberally construed in favor of the insured. So even if it's not ambiguous, another rule of construction is applicable and the court didn't apply it. I'd ask that the court reverse, and with some instructions so that we can get part of this case to Judge Moreno where it belongs. There's, if we, even if this court issues a non-published decision or disposition order, that will have an effect. Because this is a, this case is already in Florida in a way. The subscribers just don't have a voice yet. Who doesn't have a voice yet? The policyholders. This is, the Florida case is healthcare providers versus the Blue Cross system. But right now the policyholders are, they're twisting in the wind. And I didn't file a damages case or a fraud case or anything else. All I'm saying is if there's a payment out, that it should be reimbursed by the board members who are being accused of civil racketeering. Thank you. All right. Good morning, your honors. May it please the court. My name is Ellen Carson. I'm counsel on behalf of the Defendant Appellant Hawaii Medical Service Association. And I'd like to reserve five minutes for counsel for the Blue Cross Blue Shield Association. Really the main issue here by the plaintiff is that Ms. Kalar would like coverage under her HMSA plan for lung volume reduction surgery. Her real gripe is that it's not covered under her HMSA plan. And no contorted interpretation of the plan terms can make it covered. It's uncontested that lung volume reduction surgery was under an ongoing clinical trial. A phase three clinical trial. That there was reliable evidence coming out of the preliminary results of that study that were reported in the New England Journal of Medicine. That stated that the results for people like Ms. Kalar were that there was an unreasonably high risk of death. And that they were unlikely to get any benefit from the procedure. And in fact the study had begun to withdraw persons who had the same medical factors as Ms. Kalar does in regards to her emphysema. Because there was too high a rate of death. The plaintiff's counsel has just admitted that that is the authority that was in place at the time that all of these actions occurred. The record has nothing else. That is what the medical science, the best of what medical science had to offer. And yet there is no basis for her to be able to interpret that just because she wants it, somehow it should be covered by her RISA plan. That's not the standard at all. Her RISA plan through HMSA said that in order to get coverage it could not be an excluded item. And excluded items included things that were under ongoing clinical trials such as a phase three trial. Or those for which there otherwise was still a study in regards to either their safety or their efficacy. There are some trials that are conducted even though a procedure has become common. And they say well let's do an evaluation and we'll have some sort of a trial to see whether things are going as we thought they would do when we approved this whole thing ten years ago. Does that suddenly take that procedure out of coverage? Your Honor, I think that there are some procedures where exactly what you've described is true. I think the difference for lung volume reduction surgery is that it had been in existence not for a long time. It was always a rather unusual procedure. I understand that might be different. I'm just kind of wondering in how we construe a clause that excludes things that are in clinical trials. Does it mean that even if there is a procedure that's generally accepted that the insurance companies have been paying for for years, if somebody decides to evaluate it by some sort of a trial it suddenly is removed from coverage under this exclusion? Your Honor, the broader question that you've just phrased is one that I believe is beyond the reach of where we need to be simply today. Simply because in this case the clinical trial that resulted is one that had specific reliable evidence from one of the most authoritative medical sources that can be named that showed that people like Ms. Kalar with her type of emphysema were going to be unhelped and were going to be facing unreasonable risk of life. We're construing a clause in the policy. So that's why you've got a hypothetical. This is treated as a hypothetical and answered Judge Canby's question. Yes, well as a hypothetical in that regard, if there was a service that the standard of care believed had been medically acceptable and effective and necessary before and that service then came into study but none of the studies had shown that it was unsafe, ineffective, I believe that that would likely be able to be continued under certain circumstances. Now this particular language... I don't know if a clause would permit it, would it? Doesn't it just exclude things that are subject to clinical trial? Your Honor, I believe that what is done is an analysis both under the HMSA plan language as well as an analysis under the statute in Hawaii which refers to medical necessity and both the HMSA plan relies in part on medical necessity and appropriateness as does the state law. And so one would still need to see whether that procedure was something that was known to be effective. If it is not known to be effective, then it would not be covered. And even the fact that it's under study would not make it something that is effective. In this particular case or in the hypothetical, you have the situation where the study ends up showing that it is not known to be effective. So whether you proceed under the plan terms or whether you proceed under HMSA's terms or under the medical necessity statute in Hawaii, you would still need to look to see whether the treatment that's being requested is known to be effective and is medically necessary and appropriate for the particular person. So in your hypothetical, it would depend upon what are those preliminary studies showing. And if there was no New England Journal of Medicine, there were no preliminary findings showing that it was unreasonable risk of death, then that is a situation perhaps in which one could be able to continue the analysis of what it was then shown to be medically necessary and appropriate. But I believe that once it becomes under study, in many cases like this one, what would happen is that it could no longer be shown to be medically safe and effective even though it was earlier believed to be that way, simply because now there is new medical evidence available and that new medical evidence, like the New England Journal, the NATT study, shows that it's unreasonably dangerous. There's many people dying from this particular procedure. And not only that, but it has no measurable benefit for the people that do undergo it. So I believe that that would take it out of that. HMSA had apparently approved this procedure earlier for some patients. Your Honor, the plaintiff had argued that there were earlier grants of lung volume reduction surgery, and I believe that the record reflects that there were a very few of those, all of which occurred before the lung volume reduction surgery study of the NATT, the preliminary results of which were published just right before Ms. Kallar's physician requested coverage for hers. And there may have been one or possibly two coverages of that under a very separate plan that had a different definition of coverage in regards to its inclusions and exclusions, and therefore was not considered to be the same because one needs to look at the contract language to tell what the contract is giving you. Her claim for coverage is without merit under ERISA because whether you take the discretionary review standard or the de novo review standard, the reality is that the plaintiff has not submitted anything to show that it was safe, that it was efficacious, that it was going to be medically effective for what she wanted. She has not shown any authorities, and she admits that there were no authorities, that the status of the medical science was that medical science deemed this to be unsafe. Therefore, whether you proceed with a discretionary clause or you proceed without one under a de novo standard, you get to the very same result that the record is devoid of anything showing that the plaintiff should have had this type of coverage. And it was excluded not only because of the medical necessity language, but because also of the plan language in regards to the definition of experimental and investigational. The sources that she wishes to rely upon are not valid for two reasons. One, she wants to rely upon insurance commissioner proceedings that were expressly preempted by ERISA, and that ruling came out just weeks later in regards to the Hawaii Supreme Court acknowledging that the entire agency proceedings, which she had pursued with the insurance commissioner, were preempted by ERISA. And therefore, where there is no jurisdiction, of course, there cannot be deference or any type of preclusive effect, and HMSA was not obligated to continue defending in that particular forum. She also relies upon a memorandum issued by the insurance commissioner after the final judgment in this case was issued in a situation where the insurance commissioner determined really by agency fiat that discretionary clauses should not be in existence in Hawaii. But that cannot apply retroactively, and neither can it apply without going through the administrative law procedures that Hawaii, just like the federal government, has in regards to requiring notice before rulemaking takes place and also that requires contested case adjudicatory proceedings. So both of the sources of authority she attempts to rely upon do not help her there, and in any event, even if she could get past that, the problem is she has no evidence whatsoever in regards to those issues about any safety of the surgery that she underwent. I'd like to address for just one moment the declaratory judgment claims that are in counts one and six. These are the ones that she wanted to have transferred to the MDL in front of Judge Marino. She admits that these are claims for alter ego or for veil piercing. She also admits that there is no cause of action for alter ego or veil piercing. There was no claim that survives here, and there is no claim that should survive, so that any theory of veil piercing or alter ego is simply invalid and should be dismissed. What is the relationship of the Hawaii plan and Blue Cross? What is that relationship? HMSA is a licensee of the Blue Cross Blue Shield. HMSA issues plans like these to employers who use them as their ERISA plan. Blue Cross Blue Shield is an organization that, to my understanding, does not issue plans of its own, but provides a network and a license to be able to use Blue Cross Blue Shield plans, and then also has an advantage for the members of those plans in that they can be able to use benefits as they cross state borders, so that if you have a Blue Cross or a Blue Shield plan, it's not just restricted to getting services within your own area, but you may cross a state border. And if there are Blue Cross Blue Shield participating providers there, you may obtain many of the same benefits while you're in that jurisdiction temporarily. And they all agree to accept a certain amount of money for each particular procedure? In general, Your Honor, that is correct, that if you are a participating provider under contract with HMSA, for example, that part of your contract is that you will accept a maximum level of income for a particular procedure. We call it the eligible charge, and that you will not try to charge an HMSA member any more than the eligible charge that you have agreed to by contract. Okay, so let's get personal matters, since you're the expert. So I had some open heart surgery, valve replacement. I think the bill was like $250,000. And the carrier on the plan paid, oh, let me just see what it said. It said like $140,000. And then I was told by the plan, well, look, we just saved you $110,000. So I'm wondering when am I going to get my $110,000 that they saved me? I don't think you'll see it, Your Honor. What you do see is that had you not had that particular plan, you would be $110,000 more in the hole. And so what they have done is saved you in the same sense that when Kmart says that it's saving you 30% off this week on so-and-so, that is money that you're not needing to pay. Well, I shouldn't wait for that check. I wouldn't, Your Honor. But the reason that these declaratory judgment claims are also invalid and were properly dismissed by the district court. Why do the doctors bill that amount if they know they're only going to get so much? Your Honor, I think that that is what they consider to be their full fair market value of their services. But they are willing to exchange that for a lower rate in exchange for being able to get a high volume of services These are the other benefits that these contracts represent, and one of the primary benefits these contracts represent is that the plan itself pays the doctors, so they don't have to come collecting from patients, and that surely must be one of their greatest struggles as many of the people who need to receive medical care may not have the money to pay for it. So one of the great benefits that doctors get in exchange for a lower eligible charge is that they no longer need to collect from patients except for something very small that's called a copay. So it's not a marketing gimmick. Your Honor, I believe it's something that is meant to negotiate the best rate for medical services for the members of a plan so that they can have a broad coverage at the lowest rates possible, but need to confine that coverage by excluding certain things, and that's what this case is about. Just because you have an ERISA plan or just because you have a health plan doesn't mean that you get coverage for absolutely everything that you want or for an experimental modality that's in a clinical trial for which the clinical trial has shown that it's not going to be safe, and that's the real beef that Ms. Kalar has, but it's nothing that she has a legal remedy for, and therefore there's not really a declaratory judgment action here either because all of the harm that she alleges is just purely speculative. She didn't have a plan that covered this. She doesn't show that there's an injustice or a corporate form that's being used in some way to subvert rights. She hasn't pled the fraud with particularity, and she has really no standing because she doesn't have a concrete injury there. The MDL case that she refers to is one that does involve only providers, and the MDL has dismissed the subscribers from that. So both the Judicial Panel on Multidistrict Litigation as well as the judge and the district court here both determined that there were no commonality of issues involved and that it was proper not to transfer those claims to the MDL. Okay. Thank you. I will rely on the rest of the briefing for the other points unless the court has any other questions. No, we're fine. Thank you. Thank you for your enlightenment. Good morning. May it please the court. My name is Peter Olson. I represent Blue Cross Blue Shield Association. I will heed the court's admonition to be very brief. I'm basically here to do a me too with the arguments that Ms. Carson made on behalf of HMSA. We believe the court correctly ruled that the plaintiff's punitive state law claims were all preempted by ERISA and that there wasn't a cognizable claim stated under the RICO statutes. More importantly, with respect to the alleged liability of my client, Your Honors, I believe the district court properly recognized that this fundamentally is a dispute between the plaintiff and her employer-provided health care plan, HMSA, which in no way involves Blue Cross Blue Shield Association. A plaintiff attempted to bootstrap a claim against Blue Cross Blue Shield Association by making this alter ego argument and the district judge ruled there wasn't an alter ego cause of action and under the facts and circumstances of the case, there wasn't an independent basis for disregarding the corporate separateness of HMSA and going after Blue Cross. We believe that was an appropriate ruling. So the employer creates the plan and then makes it available to the employee and then the employer's obligation under the plan is then handled by Blue Cross Blue Shield. Is that the way it works? No, the plan is administered by the employer, but the actual party paying the benefits is HMSA. Ms. Carson correctly explained that basically Blue Cross Blue Shield Association is a licensor. It owns the names and the marks and it licenses the names and the marks to autonomous and independent health care plans and I think there are about 40 some odd plans throughout the United States. So Blue Cross licenses the name and the mark and provides some administrative services to the companies that actually administer the plans, but Blue Cross does not itself offer any plans. It does not administer any plans. Those are done by the autonomous and independent companies such as HMSA who purchase and license the name and the trademark. So unless Corey has any questions, that's all I have to... There's no, I think it's apparent from what you said, there's no parent subsidiary relationship. No, the Blue Cross Blue Shield Association is a not-for-profit Illinois corporation. The shareholders, I believe, are the individual associations who purchase the name and the trademark, but it is an autonomous company and HMSA is autonomous of Blue Cross. So it's basically a membership association. Correct, Your Honor. All right. That's all the presentation I have unless, of course, there's any further questions. Thank you. Okay, thanks. Any rebuttal? Thank you, Your Honor. Blue Cross Blue Shield also has, Blue Cross Blue Shield Association has more than just a license or licensee relationship with its subdivisions. The care that the panel needs to take with this issue is that it's before Judge Moreno in Florida in a centralized court, this issue, what the relationship is between these 42 so-called plans and Blue Cross Blue Shield. There, the alter ego issue is alive and well. It hasn't been decided yet, but if this panel decides one way or another on it, it could have a major effect on what Judge Moreno is doing there. And right now, we haven't had a plenary trial on that issue. We haven't had discovery on it. We haven't been allowed any discovery. This lawsuit was pre-filing. None of this was obtained by any discovery. So it would be unfair, I think, to usurp Judge Moreno's ongoing proceedings with a ruling based on this record that Blue Cross Blue Shield is simply not an alter ego. Secondly, that declaratory judgment count that I've alleged is not alter ego alone, as Ms. Carson tells you. It is other things, too. And it is, as I described it, an indemnity, sort of a reverse indemnity count that says if A pays B, then A has got to pay back the treasury and the reserves of all these plans. Our plan here has millions of dollars in reserves. We're in a Blue Cross Blue Shield litigation in Florida, which if Judge Moreno says you're all one big family, he could aggregate those reserves from all the plans nationwide. Some of them are going to be short, and some of them are going to be, like ours, really rich. If he decides at trial to spread out all that money and pay back the doctors, we lose, because we've had to pay for weak plans. So it's an incredibly important issue, and it can't be decided without a trial. And it can't be decided based on what Blue Cross Blue Shield says about itself. The MDL has not dismissed Blue Cross Blue Shield for subscribers. It has dismissed, in other cases, subscribers in other cases. Has the doctor here got a claim? Yes, the doctors. Your doctor. Oh, if he has a claim, he won't find out about it until there's a settlement in Florida or if there's a verdict. So if he gets paid, then he has to give the money back to your client, right? Well, if the doctor gets paid, all that has happened in the Florida cases is the doctors are saying, what you did was you partially paid us, mostly. You gave us 10 cents when we needed 12. And you did it over millions of people, 622,000 doctors and some other non-physician providers. And you did it on a monthly basis. So it's all done by computer. So they want it back. And it was done through medical bill coding, through computer programs. But when they do get it back, it's going to put all of these plans, it'll put some of them under. Some will probably have to go into rehabilitation unless the Blue Cross people win. Others, like ours in this state, will just end up short. So all of the declaratory relief case that I have that I'm trying to transport to Florida says is that we want it back. As far as the alter ego stuff goes that's in that count, that's also before Judge Moreno. And it was tailored for litigation there. Thank you. Okay. Well, thank you very much. The matter will stand submitted. We'll recess until 9 a.m. tomorrow morning. Thank you. Thank you.
judges: B. Fletcher, Pregerson, Canby